# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE PARAMOUNT GOLD AND SILVER CORP. STOCKHOLDERS LITIGATION | CONSOLIDATED C.A. No. 10499-CB |

## MEMORANDUM OPINION

Date Submitted: February 10, 2017
Date Decided: April 13, 2017

Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, and Jeremy J. Riley, RIGRODSKY & LONG, P.A., Wilmington, Delaware; Derrick B. Farrell, DLA PIPER US LLP, Wilmington, Delaware; Michael Van Gorder, FARUQI & FARUQI, LLP, Wilmington, Delaware; Peter Andrews, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Shannon L. Hopkins and Sebastiano Tornatore, LEVI & KORSINSKY LLP, Stamford, Connecticut; Michael Palestina, KAHN SWICK & FOTI LLP, Madisonville, Louisiana; Juan E. Monteverde and James M. Wilson, Jr., FARUQI & FARUQI, LLP, New York, New York; Joshua Lifshitz, LIFSHITZ & MILLER, Garden City, New York, *Attorneys for Plaintiffs*.

Albert H. Manwaring, IV and Albert J. Carroll, MORRIS JAMES LLP, Wilmington, Delaware, *Attorneys for Defendants Christopher Crupi, John Carden, Michel Stinglhamber, Robert Dinning, Eliseo Gonzalez-Urien, Christopher Reynolds, and Shawn Kennedy*.

**BOUCHARD, C.**

In this action, former stockholders of Paramount Gold and Silver Corporation ("Paramount") sued the members of its board of directors challenging a transaction Paramount entered with Coeur Mining, Inc. ("Coeur") that closed in April 2015. Defendants have moved to dismiss the complaint for failure to state a claim for relief.

Before the transaction, Paramount had two mining projects, one in Mexico and the other in Nevada. The transaction involved (1) the spin-off of the Nevada mining assets into a separate entity, approximately 95% of the shares of which were distributed to Paramount's stockholders, and (2) a stock-for-stock merger of a subsidiary of Coeur into Paramount (the "Merger"), which then held the Mexican mining assets but not the Nevada mining assets. On the same day it entered into the merger agreement, Paramount entered into a royalty agreement pursuant to which a wholly-owned subsidiary of Coeur acquired a 0.7% royalty interest in the Mexican mining project in exchange for a payment of $5.25 million.

The complaint asserts a single claim for breach of fiduciary duty against the seven members of Paramount's board. Plaintiffs do not challenge the independence or disinterestedness of the majority of the board, nor do they contend that the transaction should be subject to *Revlon* or entire fairness review.

Plaintiffs' primary contention is that *Unocal* enhanced scrutiny should apply on the theory that the royalty agreement, when combined with the termination fee provision in the merger agreement, constituted an unreasonable deal protection

1

device.  For the reasons explained below, I conclude that this contention is without merit because the terms of the royalty agreement did not prevent any interested party from making a competing bid for Paramount and because the termination fee in the merger agreement by itself concededly was reasonable.

I also conclude that the stockholder vote approving the transaction was fully-informed.  Therefore, under *Corwin v. KKR Financial Holdings LLC* and its progeny, the Paramount board's decision to enter into the merger agreement with Coeur is subject to business judgment rule, and the complaint must be dismissed. Finally, I conclude as a separate ground for dismissal that, even if *Corwin* did not apply, the complaint must be dismissed because plaintiffs have failed to state a non-exculpated claim for breach of fiduciary duty against the defendants.

## I.    BACKGROUND

Unless noted otherwise, the facts recited in this opinion come from the allegations of the Verified Third Amended Class Action Complaint (the "Complaint") and the documents incorporated therein.[1]

---

[1] The parties stipulated that if "Plaintiffs file an Amended Complaint and use any of the documents produced in limited discovery to Plaintiffs on March 30, 2015 in their Amended Complaint, Plaintiffs agree that any or all of the documents produced in limited discovery to Plaintiffs on March 30, 2015 are deemed to be incorporated by reference in that Amended Complaint."  Am. Stipulation and Order Governing Briefing on Defs.' Mots. to Dismiss ¶ 1 (Trans. ID. 59385071, Aug. 8, 2016).

### A. Paramount and the Parties

Before the Merger, Paramount Gold and Silver Corporation was a precious metals exploration company headquartered in Winnemucca, Nevada that had two advanced stage mining projects: the Sleeper Gold Project and the San Miguel Project. The Sleeper Gold Project was located off a main highway about 25 miles from the town of Winnemucca, Nevada. The San Miguel Project consisted of over 142,000 hectares (over 353,000 acres) in the Palmarejo District of northwest Mexico.

Paramount had not generated any revenue of its own and was heavily dependent on its largest stockholder, FCMI Financial Corp., to fund its operations and expansion. As of the date of the Merger, FCMI Financial Corp. owned approximately 15.7% of Paramount's outstanding common stock, which was listed on the New York Stock Exchange under the ticker symbol "PZG."

Plaintiffs Fernando Gamboa, Justin Beaston, Rob Byers, Jerry Panning, James Alston, and Jonah Weiss, IRA allege they were stockholders of Paramount at all times relevant to this action.

Defendants Christopher Crupi, Robert G. Dinning, Michel Stinglhamber, Shawn V. Kennedy, Christopher Reynolds, John Carden, and Eliseo Gonzalez-Urien each served as a member of Paramount's board of directors since at least 2009, and were the seven members of Paramount's board of directors when it approved the

3

Merger. Crupi, the then-President and Chief Executive Officer of Paramount, was the only management director on the board. Reynolds and Gonzalez-Urien were designated to the board by FCMI Financial Corp.

### B. Early Expressions of Interest in Paramount

At various times from 2007 to 2014, Coeur Mining, Inc. had expressed an interest in acquiring Paramount's San Miguel Project, and had entered into several confidentiality agreements with Paramount to obtain confidential information in pursuit of its interest in the San Miguel Project. During this period, Paramount also explored the possibility of a business combination with other exploration and mining companies, and entered into confidentiality agreements with those companies to facilitate due diligence. None of these discussions resulted in a proposal that Paramount's board could recommend to its stockholders.

In October 2012, Coeur inquired whether Paramount would be interested in selling a portion of its San Miguel Project for cash and shares. Paramount rejected this proposal. In February 2013, Coeur again expressed its interest in the San Miguel Project, which led the Paramount board to invite five investment banks to make proposals to serve as its financial advisor in connection with a possible sale of all or a portion of the company. The Paramount board ultimately deferred the decision to hire a financial advisor.

## C. Negotiations Leading to the Merger

In September 2014, Coeur sent Paramount a letter of intent describing a proposed transaction that would result in Coeur acquiring Paramount, with Paramount spinning off its Nevada business into a standalone public company ("SpinCo"). The letter of intent contemplated mixed consideration of 20.6 million shares of Coeur common stock and $19.7 million in cash. Coeur also would receive 9.9% of the fully diluted equity of SpinCo.

Later in September, the Paramount board made a counter-proposal to the Coeur offer, which contemplated mixed consideration of 20.7 million shares of Coeur common stock and $85.2 million in cash and required Coeur to purchase a 9.9% equity interest in SpinCo for an additional $6.2 million. The counter-proposal also included the sale to Coeur of a 0.5% royalty interest in the Sleeper Gold Project for $12 million in cash, and the sale of certain mining claims in the Spring Valley District of Nevada for $6 million in cash. Coeur's board rejected this counter-proposal.

On October 14, 2014, the Paramount board engaged Scotia Capital (USA) Inc. ("Scotia") as its financial advisor.

On November 7, 2014, Coeur sent Paramount another draft letter of intent setting forth the general terms under which Coeur would acquire Paramount in a stock-for-stock transaction. The letter of intent provided for the issuance of

5

approximately 32.7 million shares of Coeur common stock, equating to approximately 0.20 share of Coeur common stock for each outstanding share of Paramount common stock. The letter of intent again contemplated that Paramount would spin off its Nevada operations into SpinCo. It also contemplated that Coeur would invest $10 million in cash in SpinCo and that SpinCo would combine with another public company, with Coeur receiving a 4.9% interest in the combined company. Coeur also proposed to enter into a royalty agreement with respect to the San Miguel Project for $5.25 million.

On November 10, 2014, Paramount's board met to consider Coeur's most recent proposal and created a special committee comprised of "all of the independent members of the board excluding one independent member who had disclosed to the board his potential conflict of interest due to his relationship with the third party proposed to combine with SpinCo."[2] The board created the special committee "solely to consider the proposed transaction between SpinCo and the third party."[3]

On November 14, 2014, the special committee decided to abandon the proposed business combination between SpinCo and the third party and instructed management to seek an alternative structure for the spin-off. Over the next several

---

[2] Compl. ¶ 75.

[3] *Id.*

6

weeks, Paramount and Coeur continued to engage in discussions and their counsel exchanged drafts of documents for a proposed transaction.

**D.      The Merger Agreement and the Royalty Agreement**

On December 15, 2014, Paramount's board met to consider the terms of a proposed merger transaction with Coeur, which it unanimously approved after receiving a fairness presentation from Scotia. The next day, on December 16, Paramount and Coeur entered into a merger agreement (the "Merger Agreement").

The Merger Agreement provided for Coeur to acquire all of the outstanding shares of Paramount common stock after Paramount spun off its Nevada assets into SpinCo. Upon completion of the Merger, Paramount would become a wholly owned subsidiary of Coeur. Paramount stockholders would receive 0.2016 of a share of Coeur common stock in exchange for each share of Paramount common stock. They also would receive a *pro rata* share of a 95.1% interest in SpinCo. Coeur would provide SpinCo with $10 million in cash and hold the remaining 4.9% interest in SpinCo.

The 0.2016 share of Coeur common stock represented an implied value of $0.90 per share of Paramount common stock based on Coeur's 20-day volume weighted average price and a 19.8% implied premium over Paramount's trading price as of its last trading day. The implied value of the transaction was

approximately $146 million, without attributing any value to SpinCo. The estimated aggregate value of SpinCo was approximately $37.5 million.

Section 7.3 of the Merger Agreement provides, in general terms, that if Paramount's stockholders voted against the Merger, Paramount would be obligated to pay Coeur a $5 million termination fee if (1) an alternative acquisition proposal was made to Paramount's stockholders or to Paramount, and (2) within twelve months after the termination of the Merger Agreement, Paramount consummated an alternative transaction.

On the same day Paramount and Coeur entered into the Merger Agreement, Paramount and certain of its subsidiaries entered into a royalty agreement concerning the San Miguel Project with Coeur Mexicana S.A. de C.V. ("Coeur Mexicana"), a wholly-owned subsidiary of Coeur (the "Royalty Agreement"). Under the Royalty Agreement, Coeur Mexicana would receive a perpetual royalty "privileged and preferential in payment" of 0.7% of the net smelter returns from the sale or other disposition of productions produced from the San Miguel properties in exchange for a payment of $5.25 million.[4]

---

[4] *Id.* ¶ 105.

## E.    The Merger Closes

On January 7, 2015, Paramount and Coeur filed a joint preliminary registration statement with the Securities and Exchange Commission, which was amended three times, on February 9, 2015, March 4, 2015, and March 16, 2015 (the "Registration Statement").

On April 17, 2015, stockholders of Paramount holding over 54% of Paramount's outstanding common stock voted to approve the Merger, with approximately 97% of those voting expressing their approval.[5] The Merger closed on the same day.

## F.    Procedural History

Shortly after the Merger's announcement on December 17, 2014, six actions were filed in this Court challenging the transaction. On February 18, 2015, the Court consolidated the various actions into this action and appointed lead counsel.

By the end of March 2015, Paramount voluntarily produced limited discovery, including board minutes and Scotia's fairness presentation. Plaintiffs took no action

---

[5] Carroll Aff. Ex. A, at 33 (162,027,422 shares outstanding as of record date); Ex. C, at 2 (87,855,333 shares approved out of (i) 162,027,422 shares outstanding, and (ii) 90,665,033 shares that voted or abstained). *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170-71 (Del. 2006) (holding that the Court of Chancery may take judicial notice of the result of a stockholder vote approving a transaction where there is no reasonable dispute about the vote).

after receiving this discovery to enjoin the proposed transaction, which closed on April 17, 2015.

On February 1, 2016, after this action had been dormant for ten months, the Court requested a status report from plaintiffs' counsel. On April 8, 2016, plaintiffs filed a Second Amended Complaint in which they deleted disclosure claims that they previously had asserted.

On August 18, 2016, plaintiffs filed their Third Amended Complaint (as defined above, the "Complaint"), asserting a single claim for breach of fiduciary duty against the seven members of Paramount's board in connection with their approval of the transaction. The Third Amended Complaint added back allegations challenging certain disclosures in the Registration Statement, including allegations that plaintiffs had deleted just four months earlier.

On September 28, 2016, defendants moved to dismiss the Complaint for failure to state a claim for relief. Argument was held on February 2, 2017, during which the Court requested supplemental submissions, which were provided on February 10, 2017.

## II. ANALYSIS

The standards governing a motion to dismiss for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party

notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[6]

The Court is not required, however, to accept mere conclusory allegations as true or make inferences unsupported by well-pleaded factual allegations.[7] The Court also "is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[8]

Defendants' primary argument in favor of dismissal is that plaintiffs have failed to state a claim for breach of fiduciary duty because of the effect of the Paramount stockholders' approval of the Merger. In *Corwin v. KKR Financial Holdings LLC*, the Delaware Supreme Court explained that "[f]or sound policy reasons, Delaware corporate law has long been reluctant to second-guess the judgment of a disinterested stockholder majority that determines that a transaction with a party other than a controlling stockholder is in their best interests."[9] Thus, "when a transaction not subject to the entire fairness standard is approved by a fully

---

[6] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

[7] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE).

[8] *Gen. Motors (Hughes)*, 897 A.2d at 168.

[9] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 306 (Del. 2015).

11

informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[10]

In *Singh v. Attenborough*, the Supreme Court further explained that: "When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance."[11] Recently, the Supreme Court twice affirmed the Court of Chancery's dismissal of post-closing challenges to merger transactions based on the *Corwin* doctrine.[12]

Plaintiffs do not challenge the disinterestedness of the stockholder vote. Nor do plaintiffs allege that the Merger, which involved a stock-for-stock exchange and was approved by a majority independent and disinterested board, should be subject to either a *Revlon* or an entire fairness standard of review.[13] Plaintiffs instead contend that *Corwin* does not apply here for two reasons: (1) because the combined effect of the termination fee in the Merger Agreement and of certain provisions in

---

[10] *Id.* at 308-09.

[11] *Singh v. Attenborough*, 137 A.3d 151, 151-52 (Del. 2016).

[12] *See In re Volcano Corp. S'holder Litig.*, 143 A.3d 727 (Del. Ch. 2016), *aff'd* 2017 WL 563187 (Del. Feb. 9, 2017) (TABLE); *City of Miami Gen. Empls.' and Sanitation Empls.' Ret. Tr. v. Comstock*, 2016 WL 4464156 (Del. Ch. Aug. 24, 2016), *aff'd* 2017 WL 1093185 (Del. Mar. 23, 2017) (TABLE).

[13] Tr. Oral Arg. 51 (Feb. 2, 2017) (acknowledging that *Revlon* does not apply). Although the Complaint alleged that FCMI Financial Corp., which held 15.7% of Paramount's outstanding stock at the time of the Merger, was a controller, plaintiffs did not address this theory in their brief and abandoned the issue. Tr. Oral Arg. 12-13.

the Royalty Agreement constituted a "preclusive and *per se* unreasonable" deal protection device "rendering the vote coerced," and (2) because the stockholder vote was uninformed.[14] As discussed below, neither argument has merit in my opinion.

**A.    The Complaint Fails to Allege Facts Supporting a Reasonable Inference that Defendants Implemented Unreasonable Deal Protections**

Our Supreme Court has held that a "board's decision to protect its decision to enter a merger agreement with defensive devices against uninvited competing transactions that may emerge is analogous to a board's decision to protect against dangers to corporate policy and effectiveness when it adopts defensive measures in a hostile takeover contest," and thus should be reviewed under the *Unocal* enhanced judicial scrutiny standard.[15] In this context, "defensive devices," or "deal protection devices" describe "any measure or combination of measures that are intended to protect the consummation of a merger transaction. Defensive devices can be economic, structural, or both."[16]

---

[14] Pls.' Answering Br. 16.

[15] *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 932 (Del. 2003). Under *Unocal*, a board must first demonstrate that it had "reasonable grounds for believing that a danger to corporate policy and effectiveness existed." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985). It then must demonstrate that the defensive response adopted was "reasonable in relation to the threat posed" by demonstrating that (1) the defensive response was neither preclusive nor coercive, and that (2) the board's actions fell "within a range of reasonable responses to the threat" posed. *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1367, 1373 (Del. 1995).

[16] *Omnicare*, 818 A.2d at 933-34.

Invoking *Corwin*, defendants contend that the *Unocal* intermediate standard of review does not apply here because the Merger was approved by a fully informed and uncoerced vote of a majority of Paramount's disinterested stockholders. Plaintiffs counter that this position cannot be squared with the Delaware Supreme Court's earlier decision in *In re Santa Fe Pacific Corporation Shareholder Litigation*,[17] where the Court held in the context of a post-closing challenge that a fully informed stockholder vote approving a merger did not preclude review of certain deal protection devices under *Unocal*.[18] The Supreme Court in *Corwin* did

---

[17] 669 A.2d 59 (Del. 1995).

[18] More specifically, the Supreme Court held that a fully informed stockholder vote approving the merger of Santa Fe Pacific Corporation and Burlington Northern, Inc. did not remove from enhanced judicial scrutiny certain defensive measures (*i.e.*, adoption of a rights plan, approval of a joint tender offer and stock repurchase plan, and inclusion of a termination fee in the merger agreement) that the board of Santa Fe implemented in the face of a hostile bid by Union Pacific Corporation. After commenting that "enhanced judicial scrutiny of Board action is designed to ensure that stockholders vote or decide to tender in an atmosphere free from undue coercion," the Court reasoned as follows:

> In voting to approve the Santa Fe-Burlington merger, the Santa Fe stockholders were not asked to ratify the Board's unilateral decision to erect defensive measures against the Union Pacific offer. The stockholders were merely offered a choice between the Burlington Merger and doing nothing. The Santa Fe stockholders did not vote in favor of the precise measures under challenge in the complaint. Here, the defensive measures had allegedly already worked their effect before the stockholders had a chance to vote. In voting on the merger, the Santa Fe stockholders did not specifically vote in favor of the Rights Plan, the Joint Tender or the Termination Fee.

> Since the stockholders of Santa Fe merely voted in favor of the merger and not the defensive measures, we decline to find ratification in this instance.

*Id.* at 68.

14

not discuss or expressly overrule this aspect of *Santa Fe*.[19]  I need not address the apparent tension between *Corwin* and *Santa Fe* that plaintiffs focus on because it is apparent from the face of the Complaint and documents incorporated therein that the provisions challenged here do not constitute an unreasonable deal protection device.

As noted above, plaintiffs assert that the combination of the Royalty Agreement and the termination fee in the Merger Agreement constituted an unreasonable deal protection device under *Unocal*.  In making this argument, plaintiffs concede that the $5 million termination fee in the Merger Agreement—representing 3.42% of the estimated value of the Merger excluding SpinCo, and about 2.72% of the estimated value of the overall transaction including SpinCo—is not unreasonable by itself.[20]  This concession is sensible given that this Court routinely has upheld termination fees of this magnitude.[21]

---

[19] The Supreme Court only commented in a footnote that the parties had "engaged in an interesting debate" on appeal "about whether this Court's decision" in *Santa Fe* "supports their respective positions" about the proper interpretation of *Gantler*, but that it was not necessary "to engage in that debate, when the overwhelming weight of our state's case law" supported the decision below.  *Corwin*, 125 A.3d at 311 n.20.

[20] Tr. Oral Arg. 53.

[21] *See, e.g.*, *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1015-21 (Del. Ch. 2005) (Strine, V.C.) (holding that a termination fee amounting to 3.75% of the total equity value and 3.25% of the total transaction value, combined with matching rights, are not unreasonable deal protection measures); *In re MONY Grp. Inc. S'holder Litig.*, 852 A.2d 9, 24 (Del. Ch. 2004) (holding that a termination fee representing 3.3% of the total equity value and 2.4% of the total transaction value was "well within the range of reasonableness"); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 505-06 (Del. Ch. 2000) (Strine, V.C.) (upholding a 3.5% termination fee).

As a threshold matter, plaintiffs' *Unocal* argument hinges on whether the Royalty Agreement constitutes a deal protection device in the first place. Plaintiffs assert that the Royalty Agreement "effectively served as a second termination fee because the Royalty Agreement would have required the payment of at least an additional $5.25 million (or approximately 3.6% of the Transaction's value) by any superior bidder to unshackle the San Miguel Project from Coeur and its subsidiaries."[22] Thus, according to plaintiffs, "the combined Royalty Agreement/termination fee reached $10.25, or 7.02% of the Transaction value."[23] This amount would be problematic if plaintiffs' assertion were true, but I conclude for the reasons explained below that the contention is plainly incorrect.

The Royalty Agreement became effective when it was signed and was not contingent on consummation of the Merger.[24] More importantly, plaintiffs have not pled any facts suggesting that a superior bidder had any obligation to buy out Coeur's royalty interest in the San Miguel Project (for $5.25 million or any other price) in order to propose or consummate a transaction with Paramount. Instead, absent some impediment built into the Royalty Agreement, which I address below, a potential bidder could simply acquire Paramount subject to the Royalty Agreement, thereby

---

[22] Pls.' Answering Br. 21.

[23] *Id.* at 22 (emphasis omitted).

[24] *See* Carroll Aff. Ex. E, at 5 (defining "Effective Date" as "the date hereof," *i.e.*, December 16, 2014), 17-18 (consummation of the Merger not a condition of closing).

16

assuming the obligations under the Royalty Agreement and reaping the benefit of the $5.25 million cash infusion. In that regard, it is significant that plaintiffs do not allege that Paramount received inadequate consideration in exchange for the 0.7% royalty provided in the Royalty Agreement.

In their Complaint and in briefing, plaintiffs relied on Section 17.2(3) of the Royalty Agreement to argue that Coeur could use the Royalty Agreement to block Paramount from entering into an alternative transaction.[25] Section 17.2(3) of the Royalty Agreement provides that: "The Owners and Parent shall not allow a Change of Control of the Owners without the prior written consent of [Coeur Mexicana and its successors-in-interest], such consent not to be unreasonably withheld."[26]

Under the Royalty Agreement, "Owners" refers to the two Paramount subsidiaries (Paramount Mexico and Minera Gama) that owned the San Miguel Project, "Parent" means "Paramount Gold and Silver Corp. and includes all of Parent's successors-in-interest," and "Change of Control" means "Parent" ceasing to own all of the issued and outstanding voting securities and participating securities of either Owner."[27] Thus, Section 17.2(3) applies only if there is a change of control of the two specified subsidiaries of Paramount. Critically, Section 17.2(3) does not

---

[25] Compl. ¶ 106; Pls.' Answering Br. 22.

[26] Carroll Aff. Ex. E, at 29 § 17.2(3).

[27] *Id.* at 4-6.

17

apply to a change of control of Paramount itself. If Paramount itself were acquired, Paramount (or its successor-in-interest in a merger where it is not the surviving entity) still would own all of the securities of the two Paramount subsidiaries and there would be no "Change of Control of the Owners" that could trigger Section 17.2(3).

Recognizing the flaw in their reliance on Section 17.2(3), plaintiffs abandoned the theory at oral argument, where they argued for the first time that a different provision of the Royalty Agreement—Section 17.2(1)—could be used to block an alternative transaction.[28] As an initial matter, plaintiffs waived this argument by not raising it in their brief.[29] In any event, Section 17.2(1) also is of no help to plaintiffs.

Section 17.2(1) of the Royalty Agreement provides, in relevant part, that:

> The Owners and Parent shall not, directly or indirectly, Encumber, sell, option, assign, lease, license, transfer or otherwise dispose of, the Mineral Property or any material portion thereof (other than pursuant to an internal reorganization or to or with an affiliate or subsidiary of the Owners or Parent provided such affiliate or subsidiary first enters into an agreement, in form satisfactory to Holder, under which such party assumes the Owners's [*sic*] obligations to Holder under the Agreement) without the prior written consent of Holder, such consent not to be unreasonably withheld.[30]

---

[28] Tr. Oral Arg. 54-55.

[29] *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

[30] Carroll Aff. Ex. E, at 29 § 17.2(1).

"Mineral Property" means "the properties collectively and commonly known as San Miguel," and "Holder" refers to Coeur Mexicana and its successors-in-interest.[31]

Plaintiffs contend that, if a third party wished to top Coeur's bid to acquire Paramount, then Paramount would "directly or indirectly . . . sell, assign, . . ., transfer or otherwise dispose of, the Mineral Property,"[32] thus triggering Coeur Mexicana's qualified consent right.[33] But the San Miguel Project was owned by two Paramount subsidiaries: Paramount Mexico and Minera Gama. Paramount, as the parent company, only owns all of the outstanding securities of the two subsidiaries.[34] Thus, a sale of Paramount as a whole would not disturb the property ownership structure at the subsidiary level, and there would be no sale, assignment, transfer, or other form of disposition of the San Miguel Project in that circumstance.

Furthermore, as discussed above, Section 17.2(3) directly addresses Coeur Mexicana's consent right in a change of control situation, and confers a consent right on Coeur Mexicana only when there is a Change of Control of the Owners—the two Paramount subsidiaries—and not in the event of a change of control of Paramount itself. To now read Section 17.2(1) to confer a consent right on Coeur Mexicana

---

[31] *Id.* at 3, 6.

[32] *See* Tr. Oral Arg. 56; Pls.' Suppl. Submission 5.

[33] The consent right in both Sections 17.2(1) and 17.2(3) was qualified because consent could not "be unreasonably withheld."

[34] Carroll Aff. Ex. E, at 4.

over the sale of Paramount as a whole would read into this section a right that the parties carefully carved out from Section 17.2(3) in my view, contrary to the basic tenet of contract construction that a contract is to be read as a whole and all provisions of the contract should be harmonized to the extent possible.[35]

For the above reasons, I find that Coeur Mexicana did not have a "block right" under the Royalty Agreement to veto an alternative transaction to the Merger, and thus the Royalty Agreement was not a deal protection device. Accordingly, and because plaintiffs prudently conceded that the $5 million termination fee in Merger Agreement alone was not an unreasonable deal protection device, plaintiffs' assertion that defendants adopted unreasonable deal protection devices in connection with the Merger fails to state a claim for relief.

## B. The Stockholder Vote Was Fully Informed

Under Delaware law, when directors solicit stockholder action, they must "disclose fully and fairly all material information within the board's control."[36] A fact is material only "if there is a substantial likelihood that a reasonable shareholder

---

[35] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205-06 (Del. 2014) ("Under New York law, when interpreting a contract the task of a court is to read the contract as a whole."). The Royalty Agreement is governed by New York law. Carroll Aff. Ex. E, at 30 § 17.6.

[36] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

would consider it important in deciding how to vote."[37] In other words, information is material if, from the perspective of a reasonable stockholder, there is a substantial likelihood that it "significantly alter[s] the 'total mix' of information made available."[38] The determination of materiality is case specific,[39] and our courts have recognized that a board's disclosure obligation is "not boundless,"[40] and that the board need not disclose information simply because it "might be helpful."[41]

To overcome a *Corwin* defense, the "plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law to secure the cleansing effect of that vote."[42] Here, plaintiffs have identified three disclosure issues,[43] which I address in turn below.

---

[37] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting materiality standard of *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[38] *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1277 (Del. 1994).

[39] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997).

[40] *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007).

[41] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

[42] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *7-8 (Del. Ch. Jan. 5, 2017).

[43] The Complaint identified five disclosure issues (Compl. ¶¶ 110-16), and plaintiffs' brief discussed four disclosure issues, three of which came from the Complaint. Ultimately, plaintiffs chose to press three disclosure issues (two from their brief and a new one raised for the first time at oral argument) and abandoned the others. *See* Tr. Oral Arg. 60-61.

### 1. The Analyst Price Targets Disclosure

Plaintiffs' first disclosure challenge concerns certain analyst price targets disclosed in a summary of Scotia's fairness opinion in the Registration Statement. In a section entitled "Other Approaches," the Registration Statement states, in relevant part, that:

> Scotia Capital also considered but gave less weight to various other approaches, including a review of premiums paid in comparable transactions involving precious metal development projects, a review of the perspectives of the equity research analyst community on Paramount and a review of the relative contributions to the post-merger entity. The results of these analyses are reflected in Scotia Capital's Opinion.
>
> . . .
>
> A review of available equity analyst research generated illustrative values in the range of $52 to $81 million or $0.32 to $0.50 per share of Paramount common stock.[44]

Plaintiffs argue that the disclosed price targets of "$0.32 to $0.50 per share of Paramount common stock" directly contradict Scotia's fairness presentation to the Paramount board, which cited "analyst illustrative values ranging from $122 million to $556 million and price targets from $0.80 per share to $2.25 per share."[45] To be clear, plaintiffs' contention is not that the disclosure quoted above contradicts

---

[44] Carroll Aff. Ex. A, at 64.

[45] Pls.' Answering Br. 30 (citing Long Aff. Ex. B, at PGS000168). The slide in the fairness presentation at issue is entitled "Perspectives on PZG—Research Overview."

another disclosure in the Registration Statement, but that it contradicts another statement in Scotia's board presentation that was not included in the summary of its work in the Registration Statement.

As an initial matter, given that this section of the Registration Statement explicitly stated that Scotia Capital "***gave less weight to*** . . . a review of the perspectives of the equity research analyst community," the materiality of this information is highly questionable.[46] But even if one assumes the information was material, plaintiffs' argument is based on an evident misreading of the Registration Statement. As discussed below, when the "Other Approaches" section of the Registration Statement that plaintiffs rely on is read in context, it becomes apparent that the "$0.32 to $0.50 per share of Paramount stock" price targets concerned the value of the San Miguel Project alone, which naturally would be different from the "$0.80 per share to $2.25 per share" price targets in Scotia's board presentation that plaintiffs assert were for Paramount as a whole.[47]

The summary of Scotia's fairness opinion, spanning from page 59 to page 66 of the Registration Statement, consisted of six major sections. The first section

---

[46] *See Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at \*12 (Del. Ch. Jan. 25, 1999) (Strine, V.C.) (holding that the financial advisor's giving little weight to the valuation method at issue was a factor supporting non-materiality).

[47] *See generally* Pls.' Answering Br. 29-31.

provided an overview of Scotia's fairness approach.[48] The second section, entitled "Net Asset Value Analysis," calculated a net asset value for the San Miguel Project on a stand-alone and an adjusted basis.[49] The third section, entitled "Comparable Precedent Transactions Analysis," similarly valued the San Miguel Project on a stand-alone and an adjusted basis using a comparison to selected precious metal developer transactions.[50] The fourth section, the one at issue here, is entitled "Other Approaches."[51] The fifth section, entitled "Value of the Coeur Consideration," estimated the value of the Coeur stock to be received in the transaction based on a market trading approach.[52] Finally, the sixth section, entitled "Value of the SpinCo Consideration," estimated the value of SpinCo stock to be received in the transaction using certain analyses.[53]

The structure of the summary of Scotia's fairness analysis in the Registration Statement shows that the "Other Approaches" section concerned a valuation of the San Miguel Project alone, rather than Paramount as a whole. In particular, the

---

[48] Carroll Aff. Ex. A, at 59.

[49] *Id.* at 60-62.

[50] *Id.* at 63-64.

[51] *Id.* at 64.

[52] *Id.* at 64-65. "Coeur consideration" was defined as the right to receive 0.2016 share of Coeur common stock. *Id.* at 59.

[53] *Id.* at 65-66. "SpinCo consideration" was defined as 95.1% of the aggregate shares of SpinCo common stock. *Id.* at 59.

"Other Approaches" section immediately followed two sections estimating the value of the San Miguel Project alone, one using net asset value analyses and the other comparing the San Miguel Project to comparable precedent transactions. In this context, the title "*Other* Approaches" logically implies that this section still concerned the valuation of the San Miguel Project, although using different—or "other"—valuation methods. Indeed, because the summary of Scotia's work in the Registration Statement did not otherwise discuss the valuation of Paramount as a whole, to read the "Other Approaches" section as a section discussing the valuation of Paramount as a whole would be unreasonable.

Scotia's approach to valuing the San Miguel Project and SpinCo separately, rather than valuing the pre-spinoff Paramount as a whole makes logical sense given the structure of the transaction. After spinning off the Nevada business, Paramount's value effectively consisted of the San Miguel Project.[54] Thus, as a result of the Merger, Paramount stockholders (1) retained 95.1% of the common stock of SpinCo (consisting of Paramount's Nevada business and $10 million of additional cash) and (2) exchanged their interests in the San Miguel Project for shares of Coeur common stock. In other words, the values of the "gives" and the "gets" in the overall

---

[54] *See* Compl. ¶ 33; Carroll Aff. Ex. A, at 27.

25

transaction depend on the values of the San Miguel Project, SpinCo, and Coeur separately, and not the pre-spinoff value of Paramount as a whole.

Plaintiffs argue that the language in the "Other Approaches" section referring to "$0.32 to $0.50 *per share of Paramount common stock*" is misleading. Viewed in isolation, this sentence could be read to suggest that the value of Paramount as a whole was $0.32 to $0.50 per share. But the structure of the fairness opinion summary, as discussed above, eliminates that ambiguity when the statement is read in context. Furthermore, throughout the summary, the phrase "per share of Paramount common stock" was used as a measurement unit—a way to express the values of the San Miguel Project or SpinCo as opposed to stating the value of Paramount in the aggregate. For example, in summarizing the net asset value analysis for the San Miguel Project, the Registration Statement stated: "The NAV approach . . . generated illustrative values in the range $59 to $193 million for Paramount's interest in the San Miguel Project, *or $0.36 to $1.19 per share of Paramount common stock.*"[55] Similarly, in summarizing the comparable precedent transactions analysis for the San Miguel Project, the Registration Statement stated: "A P/NAV range of 0.5x-0.7x . . . generated illustrative values in the range of $65

---

[55] Carroll Aff. Ex. A, at 61.

26

to $91 million *or $0.40 to $0.56 per share of Paramount common stock*."[56]  Thus, reading the "$0.32 to $0.50 per share of Paramount common stock" statement in context, a stockholder would understand that the disclosure referred to analyst price targets for the San Miguel Project alone, not Paramount as a whole.

During oral argument, plaintiffs argued for the first time that even assuming the disclosed analyst price targets concerned the San Miguel Project only, the disclosure still was inaccurate.[57]  Specifically, plaintiffs pointed to certain pages from Scotia's board presentation suggesting that, when arriving at the $0.32 to $0.50 per share price targets for the San Miguel Project, Scotia applied a 0.50x-0.70x trading multiple to the analyst estimates of the net asset value of the San Miguel Project.[58]  Thus, according to plaintiffs, "even if you assume . . . that a stockholder would understand the disclosure is talking just about the San Miguel mine, they certainly have no understanding that the bankers essentially cut the numbers in half based on a trading multiple."[59]

---

[56] *Id.* at 63.  *See also id.* at 66 ("The NAV approach . . . generated illustrative values in the rage [*sic*] of $82 to $240 million for Paramount's interest in the Sleeper Project, or $0.51 to $1.48 per share of Paramount common stock.").

[57] Tr. Oral Arg. 61.  *See* Pls.' Answering Br. 29-31.

[58] Tr. Oral Arg. 62-65 (referring to Compl. Ex. 1, at PGS000168, PGS000170, PGS000182).

[59] Tr. Oral Arg. 65.

In addition to not being raised in their brief and thus waived, plaintiffs' argument is deficient for two other reasons. First, the disclosure at issue states that "A review of available equity analyst research *generated illustrative values* in the range of $52 to $81 million or $0.32 to $0.50 per share of Paramount common stock,"[60] which is different from saying that all of the equity analyst price targets *were* "in the range of $52 to $81 million or $0.32 to $0.50 per share of Paramount common stock." Thus there was no misrepresentation. Second, contrary to plaintiffs' contention, the Registration Statement disclosed that "A P/NAV range of 0.5x-0.7x was selected based on several factors, including, the average/median values of the selected transactions, market conditions at the time and Scotia Capital's professional judgment as to typical transaction multiples."[61]

For the above reasons, plaintiffs' challenge to the analyst price targets disclosed in the "Other Approaches" section of the summary of Scotia's work in the Registration Statement is without merit in my opinion.

---

[60] Carroll Aff. Ex. A, at 64.

[61] *Id.* at 63. To the extent that plaintiffs challenge Scotia's choice of the P/NAV multiple, this does not state a disclosure claim. *See In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) ("[Q]uibbles with a financial advisor's work simply cannot be the basis of a disclosure claim.").

### 2. The Cantor Fitzgerald Disclosure

Plaintiffs' second disclosure challenge concerns the role of Cantor Fitzgerald & Co. in the Merger.[62] Specifically, plaintiffs argue that the Registration Statement misrepresented that Cantor Fitzgerald, which attended a Paramount board meeting to offer advice on a potential transaction on September 5, 2014, had no further involvement in the transaction after that date.

The relevant part of the Registration Statement that plaintiffs challenge states:

> On September 5, 2014, the Paramount board reconvened to further consider the letter of intent. . . . A representative of Cantor Fitzgerald & Co., an investment bank, was in attendance to offer advice on the potential transaction. Cantor Fitzgerald & Co. had no further involvement in the transaction.[63]

Plaintiffs contrast this disclosure with the following information from the minutes of a Paramount board meeting held on December 2, 2014:

> The Board held an in camera session and invited Graham Moylan from Cantor Fitzgerald to attend the session. The purpose of the session was to discuss whether it would be prudent for the Board of Directors to retain its own independent advisor to provide, at a fixed price, a fairness opinion to the Board of Directors with respect to whether the proposed transaction is fair to the shareholders of the Corporation. Cantor Fitzgerald quoted $250,000 USD as the fee for such an opinion.
>
> . . .
>
> **BE IT RESOLVED THAT** management instruct Cantor Fitzgerald to review the facts of our transaction and the market generally in order to

---

[62] Tr. Oral Arg. 65-71.

[63] Carroll Aff. Ex. A, at 41.

put itself in a position to deliver an independent fairness opinion *if so instructed and required by the Board of Directors*.[64]

Putting the two documents together, plaintiffs argue that the Registration Statement misrepresented that Cantor Fitzgerald had no further involvement in the transaction after September 5, 2014, because a representative of Cantor Fitzgerald attended a Paramount board meeting on December 2, 2014, during which the board invited Cantor Fitzgerald to review the facts of the transaction in case it later was instructed to deliver an independent fairness opinion.

But plaintiffs, who received copies of Paramount's board minutes during discovery, do not allege that the Paramount board later "instructed" or "required" Cantor Fitzgerald to deliver an independent fairness opinion.[65] The Paramount board's mere *consideration* of having Cantor Fitzgerald issue a second fairness opinion, without more, does not mean to my mind that Cantor Fitzgerald was *involved* in the transaction. Thus, the Registration Statement did not contain any

---

[64] Long Aff. Ex. E, at PGS000252-53 (emphasis added).

[65] Because plaintiffs make no allegation on this issue, there is no basis for me to draw reasonable inferences in favor of plaintiffs either. *See Lukens*, 757 A.2d at 727 (internal quotation omitted) ("Although all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true . . . neither inferences nor conclusions of fact unsupported by allegations of specific facts . . . are accepted as true."). *Cf. In re Asbestos Litig.*, 2017 WL 510463, at *1 n.2 (Del. 2017) (TABLE) ("The Court must decline to draw an inference for the non-moving party if the record is devoid of facts upon which the inference reasonably can be based. Where there is no precedent fact, there can be no inference; an inference cannot flow from the nonexistence of a fact, or from a complete absence of evidence as to the particular fact. Nor can an inference be based on surmise, speculation, conjecture, or guess, or on imagination or supposition.").

misrepresentation when it stated that "Cantor Fitzgerald & Co. had no further involvement in the transaction" after September 5, 2014.[66]

### 3. The Scotia Fee Arrangement Disclosure

Plaintiffs' final disclosure challenge is that the Registration Statement omitted certain material facts relating to Scotia's fee arrangement. The Registration Statement disclosed that Paramount engaged Scotia as its financial advisor on October 14, 2014, and that Paramount and Scotia executed a new engagement letter on November 12, 2014.[67] It also disclosed the key terms of the new engagement letter as follows:

> Pursuant to a letter agreement dated November 12, 2014, Paramount engaged Scotia Capital to act as its financial advisor in connection with the transaction and certain other transactions. Pursuant to the terms of this engagement letter, Paramount has agreed to pay Scotia Capital a success fee equal to 1.05% of the transaction value of the transaction, excluding the value of any consideration paid for any assets of Paramount other than San Miguel, subject to a minimum of $1.25 million, all of which is contingent upon consummation of the transaction. If the transaction is consummated, the success fee payable to Scotia Capital will be approximately $1.5 million. In addition, Paramount has agreed to reimburse certain of Scotia Capital's expenses

---

[66] To the extent that plaintiffs argue the Registration Statement should have disclosed that the Paramount board considered having Cantor Fitzgerald issue a second fairness opinion as evidence that Scotia had a conflict, *see* Tr. Oral Arg. 70, I find that this information was immaterial because (1) it is not alleged nor reasonably inferable that the board ever instructed Cantor Fitzgerald to deliver such an opinion, and (2) it is not reasonably conceivable that this additional information would have significantly altered the total mix of information, because the Registration Statement's disclosures concerning the amount and contingent nature of Scotia's advisory fee (discussed below) were sufficient to put the stockholders on notice of Scotia's potential conflict of interest in this transaction.

[67] Carroll Aff. Ex. A, at 41-42.

arising, and indemnify Scotia Capital against certain liabilities that may arise, out of its engagement.[68]

Plaintiffs do not contend that any of the information quoted above was erroneous or misleading. They instead argue that the Registration Statement also should have disclosed the reason for the amendment to Scotia's engagement letter on November 12, 2014. Plaintiffs cite to minutes of a meeting of the Paramount board held on November 11, 2014, which stated the following:

> The CFO advised that Scotia Capital had requested compensation with respect to its services rendered to enable [Paramount] to obtain the proposed $10M loan from [Coeur] and the proposed $5.25M royalty (as neither were contemplated nor addressed in the original Scotia engagement letter). The CFO and CEO advised that Scotia Capital had been instrumental with respect to both the proposed loan and the proposed royalty.

> The CFO indicated that the typical rates for an investment banker with regard to such services is 6-7% of the amount raised.

> The CFO advised that [Paramount] management and Scotia had determined that a fair compromise, subject to Board approval, would be an amendment to the commission rate set forth in the engagement letter to increase same from 0.75% to 1.05% subject to a minimum fee of $1.25M. The CFO noted that such a commission rate would be at the lower end of the standard range.

> . . .

> **BE IT RESOLVED THAT** the CEO or CFO is instructed to execute such documents as are necessary to amend the terms of the Scotia

---

[68] *Id.* at 67.

Capital engagement letter to increase the fee from 0.75% to 1.05% subject to a minimum fee of $1.25M.[69]

Plaintiffs argue that the reason for amending Scotia's engagement letter should have been disclosed because this information was relevant to assessing Scotia's potential conflicts of interest.[70]  I disagree.  Because the Registration Statement disclosed the total amount and the contingent nature of Scotia's compensation in connection with the merger, Paramount's stockholders were made aware of the full magnitude and nature of Scotia's financial interest in the transaction.  How the Paramount board and Scotia negotiated to arrive at the fully disclosed final fee arrangement is immaterial in my view.[71]

* * * * *

---

[69] Long Aff. Ex. A, at PGS000245-46.

[70] Plaintiffs insinuate that Paramount overpaid Scotia for its services in connection with the $10 million loan and the $5.25 million Royalty Agreement.  Pls.' Answering Br. 42-43.  Putting aside that plaintiffs' math appears to be incorrect, their criticism of the amount paid to Scotia is not a valid disclosure claim.  *See Comstock*, 2016 WL 4464156, at *15 ("Plaintiff's substantive disagreement with that decision cannot be recast as a disclosure claim.").

[71] *See In re Om Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at *17 (Del. Ch. Oct. 12, 2016) (finding that the board's change of the compensation arrangement with its financial advisor from fixed fee to contingency fee was not material information so long as the amount and the contingent nature of the fee arrangement were disclosed, so that the stockholders "were not misled as to [the financial advisor's] incentives."); *see also  In re Sauer–Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1130 (Del. Ch. 2011) (holding that the board's "underlying reasons for acting" generally are not deemed material); *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *14 (Del. Ch. Nov. 30, 2007) (internal quotation omitted) ("a full and fair characterization [of background to a transaction] does not require . . . a play-by-play description of merger negotiations.").

For the reasons explained above, plaintiffs' disclosure challenges are without merit and thus the stockholder vote approving the Merger was fully informed.

**C.     The Business Judgment Rule Applies to the Board's Approval of the Merger**

Because the Merger was approved by a majority of Paramount's disinterested stockholders in a fully informed, uncoerced vote, the business judgment rule applies to the Paramount board's decision to approve the Merger, and the transaction may only be attacked on the ground of waste.[72]   Since plaintiffs do not assert that the board's decision to approve the Merger amounted to waste, the Complaint must be dismissed for failure to state a claim for relief under the *Corwin* doctrine.

**D.     Even If *Corwin* Did Not Apply, Plaintiffs Have Not Pled a Non-Exculpated Claim for Breach of Fiduciary Duty**

As a separate ground for dismissal, I find that even if *Corwin* did not apply in this case, plaintiffs' fiduciary duty claim still fails to state a claim for relief.  As explained above, plaintiffs do not contend that the transaction at issue implicates either a *Revlon* or entire fairness standard of review, and plaintiffs' invocation of *Unocal* fails because the Royalty Agreement was not a deal protection device.  Thus, the decision to enter the Merger, a stock-for-stock transaction, presumptively would be governed by the business judgment rule.[73]

---

[72] *Attenborough*, 137 A.3d at 151-52.

[73] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) ("Delaware has three tiers of review for evaluating director decision-making:  the business judgment rule,

Paramount's certificate of incorporation contains a § 102(b)(7) provision exculpating its directors from monetary liability for breach of fiduciary duty "to the fullest extent permitted by the Delaware General Corporation Law."[74] Plaintiffs do not challenge the independence or disinterestedness of a majority of the Paramount board, and have not articulated any conceivable basis for a loyalty claim other than to assert "bad faith." As addressed below, however, plaintiffs' allegations of bad faith are wholly conclusory and insufficient to support a non-exculpated claim for breach of fiduciary duty.

To state a bad faith claim, "a plaintiff must show either an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties, or that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[75] "Bad faith is not a light pleading standard. Even gross negligence, without more, does not constitute bad faith."[76]

---

enhanced scrutiny, and entire fairness. The business judgment rule is the default standard of review.").

[74] Carroll Aff. Ex. F. *See Intercargo*, 768 A.2d at 501 n.40 (Del. Ch. 2000) ("The court may take judicial notice of an exculpatory charter provision in resolving a motion addressed to the pleadings.").

[75] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016) (internal quotations omitted).

[76] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014).

Plaintiffs argue that the Paramount board acted in bad faith by approving certain preclusive deal protections in the form of the termination fee and the Royalty Agreement, and by failing to disclose certain material information. Both of these grounds are without merit for reasons already discussed, namely that the Royalty Agreement plainly did not operate as a deal protection device and the termination fee by itself was reasonable,[77] and that the Registration Statement accurately disclosed all material information.[78] Even if reasonable minds could disagree on the latter point, the Complaint is devoid of any facts from which one reasonably could infer that Paramount's directors intentionally disregarded their duties or otherwise acted in bad faith with respect to the disclosures in the Registration Statement.

Plaintiffs next argue that the defendants acted in bad faith by failing to inform themselves of Paramount's value by running "a rushed process" with Coeur and failing to conduct an auction or to negotiate a go-shop.[79] These allegations fall short of supporting a reasonable inference of bad faith. "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."[80] Even in the *Revlon* context, which is not the case here,

---

[77] *See supra* Section II.A.

[78] *See supra* Section II.B.

[79] Pls.' Answering Br. 58.

[80] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

"the directors' failure to take any specific steps during the sale process could not have demonstrated a conscious disregard of their duties."[81]

Mainly relying on analyst commentary and target prices, plaintiffs assert that the merger consideration "significantly undervalued" Paramount.[82] "Delaware law requires that for an allegation of price inadequacy to support a bad faith claim, the Court would need to conclude that the price was so far beyond the bounds of reasonable judgment that it seems inexplicable on any ground other than bad faith."[83] Plaintiffs have failed to allege facts from which I reasonably could infer that the Merger consideration, representing a "19.8% premium over the last day of trading,"[84] satisfies this "demanding standard."[85]

Finally, plaintiffs assert that Scotia's fairness opinion "was utterly lacking and far from complete."[86] This contention, even if true, would not support a showing of bad faith on the part of Paramount's board. To support a bad faith claim based on a board's reliance on its advisors' financial analyses, "the plaintiffs must plead non-conclusory facts creating the reasonable inference that the board purposely relied on

---

[81] *Id.*

[82] Compl. ¶ 17.

[83] *Crimson*, 2014 WL 5449419, at *23.

[84] Compl. ¶ 17.

[85] *Crimson*, 2014 WL 5449419, at *23 (rejecting a bad faith claim based on price inadequacy where the exchange ratio represented a 7.7% premium).

[86] Pls.' Answering Br. 58.

analyses that were inaccurate for some improper reason. The plaintiffs cannot simply quibble with the inputs used in the fairness opinions."[87] No such showing has been made here.

## III. CONCLUSION

For all the foregoing reasons, plaintiffs have failed to state a claim for breach of fiduciary duty, and defendants' motion to dismiss the Complaint with prejudice is GRANTED.

**IT IS SO ORDERED**.

---

[87] *In re Morton's Rest. Gp. Inc. S'holders Litig.*, 74 A.3d 656, 673-74 (Del. Ch. 2013).